UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 2:15-cr-00103-JDL |
| ) | |
| SHAWN FIGOLI, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON DEFENDANT SHAWN FIGOLI'S MOTION TO SUPPRESS**

Defendant Shawn Figoli is charged with possession with intent to distribute a mixture or substance containing heroin and fentanyl, in violation of 21 U.S.C. § 841(a)(1). ECF No. 1. Figoli seeks to suppress all statements he made to law enforcement officers on May 17, 2015, and at any time thereafter. ECF No. 34. A suppression hearing was held on February 25, 2016. For the reasons discussed below, I grant the motion in part and deny it in part.

**I. FACTUAL BACKGROUND**

On May 17, 2015, the Maine State Police ("MSP") received a report of a vehicle operating erratically. MSP Corporal Edmund Furtado subsequently located the suspect vehicle in the parking lot of the Kennebunk Service Plaza at approximately 3:00 p.m. The vehicle was backed into and straddling two parking spaces. Corporal Furtado approached the driver's side of the pickup truck and encountered an individual later identified as Figoli. Corporal Furtado testified that Figoli exhibited signs of impairment that, from his certification as a drug recognition expert, he knew to be associated with narcotics use: lethargy, constricted pupils, and "slow and raspy" speech.

Over the course of the interaction with Figoli in the parking lot, Corporal Furtado asked Figoli for his identification and whether he was currently taking any medications, whether he needed medical attention, and when the last time he had used drugs was. Furtado testified that he asked these questions in an effort to investigate a possible operating-under-the-influence ("OUI") charge and to assess Figoli's physical state and potential need for medical assistance. A few minutes after first making contact with Figoli, Furtado observed Figoli, while seated in the driver's seat of the pickup, open a bag as he was searching for his license. Furtado saw what he recognized as "fingers" of heroin inside the bag. Furtado shortly thereafter seized the bag containing the heroin, removed Figoli from the pickup truck, and handcuffed him. Furtado subsequently conducted a search of the pickup. A short period later, a second MSP trooper arrived and stayed by the pickup to wait for it to be towed.

Corporal Furtado departed the Kennebunk Service Plaza with Figoli, still handcuffed, seated in his cruiser and drove to the York County Jail in Alfred, Maine. They arrived at the York County Jail at approximately 5:00 p.m. According to Furtado, the jail was very busy at that time, they waited in the lobby area for a while, and because no interview rooms were available, he took Figoli to the room typically used for meetings with the bail commissioner, to conduct an interview.

Corporal Furtado testified that at about 5:45 p.m., he advised Figoli of his *Miranda* rights by reading the *Miranda* card issued by the Attorney General's office and that Figoli verbally acknowledged each of the rights and agreed to answer questions without an attorney present. Furtado proceeded to question Figoli, and the

interrogation was not recorded by video or other means. The interview lasted close to an hour. Figoli was then searched and issued a summons.

## II. LEGAL ANALYSIS

Figoli argues that he was twice subject to custodial interrogation without being informed of his *Miranda* rights and without a valid waiver, in violation of his Fifth and Fourteenth Amendment rights: first, when Furtado questioned him outside of the pickup after he had been handcuffed, and second, when he was questioned at the jail after he was booked. ECF No. 34 at 1-4. The Government responds that the first questioning was very brief and directly related to a valid *Terry* or traffic stop, during which the defendant was not in custody, ECF No. 36 at 3-4, and that at the jail Figoli was properly provided his *Miranda* rights and waived them prior to any interrogation, *id.* at 5. At the hearing, the parties agreed that the defendant is not making a Fourth Amendment challenge to the stop or seizure itself.

*Miranda* warnings are applicable when a suspect is subject to "'custodial interrogation,' whether the questioning occurs in traditionally formal custody or while a suspect is 'otherwise deprived of his freedom of action in any significant way.'" *United States v. Rogers*, 659 F.3d 74, 77 (1st Cir. 2011) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). To determine whether custody existed for *Miranda* purposes, the court examines the circumstances surrounding the questioning— including where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation—and considers whether those circumstances would cause a reasonable person to have

3

understood his situation to be comparable to a formal arrest. *United States v. Murdock*, 699 F.3d 665, 669 (1st Cir. 2012) (citations omitted).

    **A.    Questioning in the Parking Lot**

As a general rule, investigatory stops pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), "do not implicate the requirements of *Miranda*, because '*Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings.'" *United States v. Streifel*, 781 F.2d 953, 958 (1st Cir. 1986) (citation omitted); *see also United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014) ("[*Terry* stops] afford officers some latitude to question witnesses about issues for which the officers have reasonable suspicion."). However, a suspect detained in an investigatory stop must be advised of his *Miranda* rights if he is "subjected to restraints comparable to those associated with a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984); *United States v. Trueber*, 238 F.3d 79, 93 (1st Cir. 2001); *see also United States v. Campbell*, 741 F.3d 251, 266 (1st Cir. 2013).

In this case, Corporal Furtado made a valid traffic stop in the plaza parking lot to investigate the reported erratic driving. When he found the suspect vehicle, it was straddling the dividing line of two parking spots and he observed that the driver, later identified to be Figoli, appeared under the influence of drugs. He requested identification and asked about Figoli's use of medications and drugs, all valid inquiries in the course of the stop, which was initially a traffic stop and then a *Terry* stop based on "a reasonable and articulable suspicion" of a drug-related crime. *See United States v. Acosta-Colon*, 157 F.3d 9, 14 (1st Cir. 1998) (citation omitted). The

4

question is whether there was a point during the interaction in the parking lot at which Figoli's "freedom of action [was] curtailed to a degree associated with formal arrest," at which point *Miranda* warnings would be required. *Campbell*, 741 F.3d at 266 (internal quotation and citation omitted).

Many of the circumstances of this stop—a single officer questioning a suspect in relatively neutral surroundings, an open space in a parking lot, the questioning not being for an extended period of time, and the initial lack of restraints, *see id.*—do not equate to formal custody. However, Corporal Furtado also observed heroin inside Figoli's bag and, at the time Furtado ordered Figoli out of the pickup, he had probable cause to arrest Figoli and Figoli was aware of this. At about 4:00 as indicated in the cruiser dash camera's video (Gov't Ex. 1), Furtado asked Figoli repeatedly for the bag and at 4:02, told him, "So I've already seen what's in the bag, ok?" Then Furtado said to Figoli, "I'm gonna end up taking you out of the car." Gov't Ex. 1 at 4:06. As of that moment, there was no doubt that Furtado was about to arrest Figoli. A reasonable person in Figoli's position, under these circumstances, would have understood his situation to be comparable to formal arrest, and not a brief investigatory detention. *See Trueber*, 238 F.3d at 93.

I therefore conclude that beginning at 4:06 in the video footage, Figoli was in custody for purposes of *Miranda*. Any statements made by Figoli in the parking lot or the cruiser from that point on are ordered suppressed.

### B.   Questioning at the Jail

A waiver of *Miranda* rights must be voluntary, knowing, and intelligent: It must have been "the product of a free and deliberate choice rather than intimidation,

coercion, or deception[,]" and it must have been "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Rojas-Tapia*, 446 F.3d 1, 4 (1st Cir. 2006).

The evidence establishes that Figoli made a voluntary and knowing waiver of his *Miranda* rights. Corporal Furtado testified credibly that he advised Figoli of his *Miranda* rights at the beginning of the interview at the jail by reading a *Miranda* card, as was his general practice. He testified that his state police report, which he prepared the day after the interview, states that he read *Miranda* warnings to Figoli and that Figoli acknowledged his rights and agreed to answer questions. Although Furtado's interview notes, written during the interview (Def. Ex. 1), do not contain a notation about *Miranda*, he explained that he typically does not include that information in his interview notes and he documented in his report the next day that Figoli was advised of and waived his *Miranda* rights.[1] Corporal Furtado also testified that at the time of the interview in the bail commissioner room, Figoli did not exhibit signs of significant impairment and did not display any hesitation or confusion.

---

[1] Figoli also challenges the interrogation that took place at the York County Jail on the basis that Corporal Furtado did not record the interrogation. Furtado testified that, to his knowledge, there was no camera or other recording device in the bail commissioner room, that an interview room that would have been equipped with a camera or other recording device was not available at the time, and that the audio recorder that had been issued to him was then inoperative. I find Furtado's explanation for his failure to record the interview credible. Further, whether or not the failure to record the interview was contrary to the written policy of the MSP, the failure to record is not itself a basis for suppressing Figoli's statements made in the interview under the Fifth and Fourteenth Amendments. *See State v. Buzzell*, 617 A.2d 1016, 1018 (Me. 1992) (finding that recording of custodial interrogation is not essential to ensure a fair trial and that electronic recording of custodial interrogation is not required by the due process clause of the Maine state constitution); *United States v. Meadows*, 571 F.3d 131, 147 (1st Cir. 2009) ("there is no federal constitutional right to have one's custodial interrogation recorded").

There is no indication that Figoli lacked the ability at the time to comprehend and make the choice to knowingly and voluntarily answer questions.

Nor do other circumstances of the interview—Furtado being the sole officer in the room, Figoli not being in restraints, the interview taking place in a closed eight-feet-by-ten-feet bail commissioner room, the cordial nature of the interaction—indicate a coercive atmosphere.

Figoli also asserts, citing the Maine Criminal Justice Academy law enforcement manual, that it is a recommended practice to obtain a written *Miranda* waiver. While a written waiver can help the Government meet its burden of showing the validity of a waiver, it is not required, *see United States v. Van Dusen*, 431 F.2d 1278, 1280-81 (1st Cir. 1970),[2] and the evidence otherwise establishes in this case that Figoli's waiver was voluntary, knowing, and intelligent, *see United States v. Speaks*, 453 F.2d 966, 968-69 (1st Cir. 1972) (finding valid waiver where defendant refused to sign a waiver of rights to remain silent and to assistance of counsel but stated that he fully understood his rights and wanted to speak with the agent); *United States v. Vaccaro*, 445 F. Supp. 2d 82, 87 (D. Mass. 2006) (finding valid waiver despite defendant's refusal to sign waiver form).[3]

---

[2] The question before the First Circuit in that case was the validity of a waiver where the suspect was given the *Miranda* warnings in writing only and the agents did not read them to him, he indicated that he understood the form, and he refused to sign the waiver but proceeded to answer questions. *Van Dusen*, 431 F.2d at 1279-80. The court stated that the burden on the prosecution "measurably increases" when there is such a refusal to sign a waiver, "followed by a willingness to talk," but also that "[i]t is clear from the *Miranda* decision and its progeny that a written waiver of rights is not required." *Id.* at 1280 (citations omitted).

[3] In this case, Figoli did not refuse to sign a waiver and had not been asked to provide a written waiver. Furtado testified that obtaining a written waiver is not required by state police procedure and that he typically does not seek one.

I conclude that Figoli's *Miranda* rights were not violated by the interrogation conducted by Corporal Furtado in the bail commissioner room at the York County Jail.

### III.  CONCLUSION

For the foregoing reasons, Figoli's motion to suppress (ECF No. 34) is **GRANTED IN PART** with respect to the statements in the parking lot beginning at 4:06 in the video (Gov't Ex. 1) and in the police cruiser as described above, and **DENIED IN PART** with respect to the statements made in the interrogation at the York County Jail.

**SO ORDERED.**

**Dated: March 4, 2016**

                                              /s/ Jon D. Levy
                                        **U.S. DISTRICT JUDGE**